IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VICKIE L. BROOKS,

Plaintiff,

vs.

Case No. 08-1376-JTM

VIA CHRISTI REGIONAL MEDICAL
CENTER, INC.,

Defendant.

MEMORANDUM AND ORDER

This Family and Medical Leave Act (FMLA) infringement action is before the court on

defendant Via Christi Regional Medical Center's Motion for Summary Judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any, show there is no genuine issue as to any

material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(c). In considering a motion for summary judgment, the court must examine all evidence in a

light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th

Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary

judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.

1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d

1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere

allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come

forward with specific facts showing the presence of a genuine issue of material fact for trial and

significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### *Findings of Fact*

Brooks was employed in an at will capacity by Via Christi at its St. Joseph Campus from May, 1998 to September 24, 2008. She was employed as a phlebotomist – she drew blood samples from patients and placed them in a centrifuge for testing – working the third shift, meaning her workday started at 10:00 p.m. and ended at 6:30 a.m. the next day. For much of the period in issue, Brooks was the third shift phlebotomist "in charge," meaning that she had some supervisory authority over other phlebotomists and some interaction with doctors and nurses.

Brooks's supervisor was Clinical Support Manager Jean Meredith. Brooks was a competent phlebotomist, and Via Christi had no problem with her work other than absenteeism.

Brooks was familiar with the Via Christi attendance policy. That policy distinguishes between scheduled and unscheduled absences. Unscheduled absences include "any absence not scheduled/approved by supervisor in advance" or, stated another way, absences "which are sudden and do not allow for adjustment of schedules." (Brooks Dep. Exh. 7.) Two or more consecutive days of missed work count as a single absence. Employees are allowed two unscheduled absences per quarter. If they exceed this number, they are potentially subject to discipline.

Brooks was disciplined and counseled for excessive absenteeism. Via Christi notes the existence of numerous citations or warnings for absenteeism during her employment:

a. December 7, 1998 – verbal warning for excessive absences;

b. March 24, 1999 – written warning for excessive absences;

c. June 25, 1999 – performance reminder ("Vicky continues to have excessive absences after having a verbal discussion and written performance reminder) (Brooks Dep., Exh. 13);

d. March 25, 2001 – performance review for 2000 ("Vickie's attendance this year however was substandard and is in deffinate [sic] need of improvement. Last year's performance goals were not met with regard to attendance") (Exh. 14);

e. February 11, 2002 – performance review for 2001 ("Vickie has shown improvement in the area of attendance but could still use some work in this area") (Exh. 15);

f. March 17, 2003 – performance review for 2002 and written warning for attendance policy violations in January and February;

g. April 11, 2003 – disciplinary document for attendance;

h. March 19, 2006 – performance review for 2005 ("you need to work on your attendance") (Exh. 22);

i. January 18, 2006 – written warning for violation of attendance policy ("The behavior you have shown has compromised the quality of care we provide to patients and customers due to staff shortages. Your behavior has shown total disregard for this department's policies") (Exh. 23);

j. June 30, 2006 – employee action plan to address attendance issue (Brooks acknowledges the need to "stop missing so much work") (Exh. 24);

k. September 21, 2006 – final written warning for violation of attendance policies ("If you choose not to comply with the Laboratory Attendance policy it will not be tolerated. Failure to meet this expectation or other employment expectations may result in additional disciplinary action up to and including termination of employment") (Exh. 25);

l. January 8, 2007 – final written warning for "tardies" during December, 2006 (Exh. 27);

m. March 18, 2007 – performance review for 2006 ("you have had an attendance issue this past year. I hope to see you continue to work on that") (Exh. 26);

n. September 12, 2007 – written warning for violation of attendance policy (Exh. 28);

o. November 12, 2007 – final written warning for violation of attendance policy (Exh. 9);

p. March 6, 2008 – performance review for 2007 (Brooks did not meet employer expectations for "service" [which included "having good attendance and being

punctual"] although Meredith noted that "since your disciplinary action you are trying to improve your attendance") (Exh. 29).

Brooks does not directly challenge the existence of any of these disciplinary warnings, but notes that in some cases (examples b, c, and j) the warnings arose from absences which were the subject of other warnings. She also stresses, as will be discussed below, that the absences in July, September and December of 2006 were to care for her father in Oklahoma.

Via Christi acknowledges that it is an "employer" subject to the requirements of the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. Information regarding Via Christi's FMLA policies and procedures is available to employees from a number of sources, including the Via Christi Employee Handbook, posters posted in work areas, brochures which supervisors and human resources personnel distribute to employees, and on vNet, the Via Christi internal employee web-site. Via Christi's employees are also advised regarding FMLA in the various disciplinary documents they are required to read and sign when disciplined for attendance infractions. Brooks signed at least seven disciplinary forms containing the following statement:

> If any absence is related to care for a child after birth or adoption; care for your spouse, son, daughter or parent who has a serious health condition; or for your own serious health condition that prevents you from being able to perform your job, you may be eligible for protected leave under the Family and Medical Leave Act. Federal law requires employment with the organization for 12 months and 1250 hours worked during the past 12 months.

> If you believe you may be eligible for this protection, contact Human Resources at 268-5192 to obtain the application and forms which must be completed by you and your attending physician.

(Brooks Dep. Exh. 9, 13, 17, 23, 25, 27 and 28).

In July, 2006, Brooks sought and was granted intermittent FMLA leave to help take care of her father, an Oklahoma resident, who had a leg amputated.

Via Christi's records suggest that Brooks also applied for FMLA leave on a second, earlier occasion, although Brooks has no recollection of doing so. This request was based on the Brooks's own "serious health condition." (Brooks Dep. at 40-41 and Exh. 2).

Via Christi notes that the surgeon caring for Brooks' father wrote in the Certification of Health Care Provider that the father would need intermittent assistance for "approx[imately] 3-4 weeks postop," yet Brooks was disciplined for tardies in December, 2007, more than four months after the surgery in issue. (Brooks Dep., Exh. 3.) The plaintiff cites Meredith's testimony that she knew the tardies were related to Brooks traveling to Oklahoma to care for her father. The intermittent leave began July 8, 2006, for 12 weeks within a rolling 12 month period, for which Brooks was required to use accrued PTO hours for work time missed. Via Christi replies that the Brooks did not object when she was written up for the tardies, and that she failed to comply with the procedures for obtaining leave.

Brooks knew that Via Christi had a FMLA policy, that FMLA-protected leave was available to qualified employees under appropriate circumstances, and that to apply for FMLA leave, she simply needed to call Marsha Geyer in Via Christi's human resources department to obtain the necessary forms. It is uncontroverted that at no point prior to her termination did Brooks contact Geyer to seek FMLA-protected status for any of the absences for which she was disciplined. In her response to the summary judgment motion, Brooks states that she did not apply for FMLA leave because she did not know that leave for dental care was covered by the FMLA.

On September 12, 2007, Via Christi issued a written warning to Brooks that she had violated the company attendance policy by having four unscheduled absences during the third quarter. Via Christi put Brooks on probation for the remainder of the third quarter and the fourth quarter.

Brooks had unscheduled absences on October 1 and 25 of 2007. It is uncontroverted that, although her two unscheduled absences within the first three-and-a-half weeks of the quarter did not constitute an express violation of the attendance policy or her probation, Brooks's supervisor had grown weary of Brooks's attendance problems and was frustrated:

Q.   But that didn't exceed any – the two absences, did it, in the quarter?

A.   (No, but that was right out of the chute she had two absences in the same month, and I was wore out, so I went to HR.

. . . .

Q. I'm trying to understand why .... What caused her to be on super probation for a year if she hadn't violated the policy?

A. Because this was – as it says, it was just disciplinary action and just – it just never stopped. And then when she went six months right out – you know coming right out, then it's when she called in twice the first month (of the quarter) and I'd have to start that whole nine-month process over again. And it was that, plus the fact that she at the time was in a position to be an example and it was just constant disciplinary action. So I called HR and I said I need help with this, this is not stopping.

(Meredith Dep., p. 56; 66-67).

The Via Christi attendance policy states: "These are attendance guidelines, but any attendance issues that support a pattern of attendance which is deemed disruptive can be addressed outside these steps at the leader's discretion." (Meredith Aff. Exh. A).

After Meredith's consultation with human resources personnel, a final written warning dated November 12, 2007 was issued to Brooks. It provided in pertinent part that:

Due to your pattern of excessive absenteeism and by remaining in a continuous state of discipline, you must bring your attendance to an acceptable level. This means: You cannot have another unscheduled absence before Jan. 01, 2008.

You will be placed on Probation for the next (4) quarters (Jan. 1, 2008 through Dec. 31, 2008) You must have no more than (2) absences in any quarter during this time period.

You must work your scheduled shift in its entirety. You cannot work a partial shift unless approved in advance using the Time Maintenance Request Form (written or using Vnet).

You cannot trade days off with a co-worker unless approved in advance using the Time Maintenance Request Form (written or using Vnet).
 . . . .
Meeting employment expectations is your choice. Understand, however, that if you

I. Have another unscheduled absence prior to Jan. 1, 2008 you will be terminated.

II. If you exceed the allowed (2) absences per quarter during the said probationary period you will be terminated.

(Brooks Exh. 9).

On April 22, 2008, Brooks saw a dentist and had a tooth extracted. After the extraction, Brooks had seven remaining lower teeth, six of which showed signs of decay. Brooks and her dentist

6

initially discussed making an attempt to save some of Brooks's remaining lower teeth, and fitting her for a "partial" (as opposed to a "full") lower denture.

At some point between April 22 and May 29, 2008, Brooks had a discussion with her dentist about the possibility of having some or all of her remaining lower teeth extracted in order to be fitted for a full or partial lower denture, and decided to go forward with the extraction of all of her remaining lower teeth. It is unclear why Brooks decided to go forward with the extraction of all of her remaining lower teeth, although her dentist, Jasmine Steven Rupp, observed that "a lot of times the patient just decides to not spend the money on the cavities, just take them out and do a full lower denture." (Rupp Dep. at 20).

In order to fashion a full lower denture, it is necessary to take an impression of the patient's mouth using a putty-like material called Algonet. There are two approaches to obtaining the needed impression in terms of timing. In some cases, the dentist will proceed with the extraction of the remaining teeth first, and allow the gums to heal prior to making the impression necessary to fashion the denture; however, if the patient does not wish to go without teeth for a prolonged period, the impression is taken before the remaining teeth are extracted, the denture is fashioned, and is then delivered and installed the same day the patient presents to have his or her teeth extracted. This is referred to as an "immediate" denture. (Rupp Dep. at 31-32).

In Brooks's case, an impression for an immediate denture was taken on May 29, 2008. The dental lab requires ten business days to fashion a full lower denture from an impression. The extraction of Brooks's remaining lower teeth and installation of the full lower denture was scheduled for June 16, 2008, a Monday.

Prior to the date scheduled for the procedure, Brooks told Meredith, "I was going to have my bottom teeth pulled and asked her if I could put in for PTO (paid time off)." (Brooks Dep. at 57).

Brooks recalls that she asked for a week of paid-time-off starting on the extraction date, June 16, 2008.

Meredith testified that Brooks first asked for three weeks of paid-time-off following the extraction procedure "because they wouldn't have her teeth ready." She testified that Brooks later told her the dentist would not need three weeks to prepare the denture, and asked for two weeks of paid time off. Meredith granted the request.

Meredith did not assume that Brooks would be physically incapacitated for any particular period of time following the extraction of her teeth. Brooks acknowledged in her deposition that she said nothing to Meredith to suggest that she would be physically unable to work following the extraction procedure or, if so, for how long. She did not tell Ms. Meredith how many times she would need to see the dentist, and did not know what her condition would be following the procedure. Meredith knew that Brooks was asking for two weeks off, and understood it was because Brooks would be embarrassed to work without dentures. Her dentist Dr. Rupp testified that for cosmetic reasons, many patients "don't want to go without teeth in." (Rupp Dep. at 32).

The decay process involving Brooks's lower teeth took place over a period of years. Brooks's dental condition in May and June, 2008 was not acute. If it had been, arrangements would have been made to address the situation more promptly.

The dentist never told Brooks that she should not work, or that she should limit her activities in a manner that would have prevented her from working, because of the extraction procedure or the installation of Brooks's denture. He testified that in some cases, patients are able to work the next day, or it might take a week. There is no evidence apart from Brooks's own testimony that she could not work for any particular period of time following the procedure. Brooks testified that she did not believe she could have worked on June 17, 18 or 19 because of pain and difficulty in speaking.

Brooks's seven lower teeth were extracted and her full lower denture was installed on June 16, 2008, at her dentist's office. The dentist's notes show no complications were encountered and the procedure required approximately one hour.

Dentists distinguish between tooth extractions that are "simple" or "routine," on the one hand, and "surgical" extractions, on the other. If a tooth can be extracted in a single piece using an

elevator and forceps, it is "simple" or "routine." If a tooth breaks into pieces, or it is necessary to use other tools to remove it, the procedure is referred to as a "surgical" extraction. Procedures of this character are sometimes referred to oral surgeons to undertake. Each of the extractions undertaken on June 16, 2008 was routine.

Brooks's dentist has been in practice for approximately two years. During that period of time, she has performed hundreds of extractions. Procedures involving the extraction of multiple teeth to accommodate a denture are likewise common. Brooks's dentist or her assistant distribute pre-printed instruction forms to patients who have had teeth extracted or have had an "immediate" denture installed. The forms describe commonly-encountered aftercare problems. The form relating to immediate dentures advises patients that they "may experience sore spots" from "uneven pressure being applied to the healing gum tissues;" patients are advised that the dentist's staff "will adjust the denture as these problems occur." (Rupp Dep Exh. 36). It is common for patients to return at least twice for this purpose, and this is not regarded as a "complication" of the procedure. The form relating to extracted teeth advises patients that: "During healing you may notice small bony fragments working their way through the gums. We can easily remove them if they are too annoying." (Rupp Dep. Exh. 35).

Brooks returned to her dentist's office on June 17, June 20, June 25 and July 7, 2008 in order to have her denture adjusted. These adjustments were carried out by dental assistants. There were no charges for these visits. On June 27, Brooks called the dentist's office and requested an extension of the pain medication (Darvocet) which she had been given on the date of the extraction.

Brooks was on scheduled for paid-time-off from Monday, June 16, 2008 – the date her teeth were extracted and the denture installed – until her return on Saturday June 28, 2008.

Brooks worked a full shift on June 28, June 29 and June 30, 2008. July 1, 2008 was a scheduled day off.

Brooks was scheduled to work on July 2 and July 3, 2008, but did not show up. She has testified that she did not go to work on these two dates because she was experiencing pain

attributable to a bone chip. The pain made it hard to use her denture plate, and she didn't like the way she looked without using the plate. She called her dentist's office to see if anything could be done but could not get in. Brooks called in to Via Christi to notify it of the absence, stating she was having problems with her mouth, that it was hard to have her denture plate in for talking.

Rupp tries to see patients as soon as possible when aftercare issues surface, and testified that "we tell them to come right down if they need to." Rupp has no record of Brooks attempting to contact her office on July 1, 2 or 3, 2008. (Rupp Dep at 49-50, 55). However, it is possible that Brooks called in on July 2 or 3, and couldn't get in until July 7.

Brooks worked on July 4, 2008. She was not scheduled to work on July 5 or July 6. She was scheduled to work on July 7 and July 8.

On July 7, before her night shift was scheduled to begin, Brooks returned to Rupp for the adjustment of her denture and the removal of a bone chip. The removal of the bone chip relieved the pain Brooks was experiencing. Brooks states that she called in to tell Via Christi she would miss work July 7 and 8.

Brooks has not been back to her dentist since July 7, 2008. She never required inpatient care in a hospital as a result of the procedure.

No doctor or dentist told Brooks she could not or should not work on July 2-3 or July 7-8, 2008. There is no medical or dental evidence that she was incapacitated on these (or any other) dates.

Brooks knew the absences of July 2-3 and July 7-8, 2008 would be considered unscheduled absences for purposes of the final written warning dated November 12, 2007.

Brooks' father died in August, 2008. Brooks missed three scheduled days of work, for which she was excused and paid pursuant to Via Christi's bereavement leave policy.

Brooks did not report for work as scheduled on September 5, 2008. Meredith called Brooks at home, spoke to her for 45 minutes. Brooks told Meredith she was "having a really hard time dealing with her father's death." (Meredith Dep. at 90). Meredith agreed to treat the absence as a

scheduled absence for purposes of the final written warning, but told Brooks very specifically that her job was in jeopardy, that she must not have any additional unscheduled absences during the third quarter, and that if she called in again she would be terminated. The leave granted was in addition to the three days of bereavement leave that had been extended the previous month.

Asked why she spoke to Brooks at such length, Meredith said: "Because I know her, and she – I knew – I didn't want her to lose her job because I – it's hard to get jobs. I know myself, I would not want to go start out again at the bottom somewhere else at our age, you know. And her retirement, you know, health care, everything, was all rolled into this. And I knew she wasn't thinking clearly and I knew she would really regret it after she was terminated." (Meredith Dep. at 122-23).

Brooks did not show up for work as scheduled on September 24. It is uncontroverted she was aware that her absence would be considered her third unscheduled absence during the third quarter and, thus, grounds for termination.

Upon learning of the unscheduled absence, Meredith set in motion the process of terminating Brooks' employment for having unscheduled absences during the third quarter in excess of those allowed by Via Christi policy and the terms of her probation, as set forth in the written warning dated November 12, 2007. All needed approvals were obtained and Brooks was terminated. Meredith classified the Plaintiff as "eligible for rehire" by Via Christi.

From the time of her termination until her deposition on June 11, 2009, Brooks applied for, or thought about applying for, a total of five jobs, including a bookkeeping job with Barker Enterprises (a trucking company in Kansas City); an assembly line job at the Dillon's packing plant on West Kellogg; a job driving a "pilot car" for Herb Foulk and Sons Trucking; a cashier's job at Walgreen's (Brooks did not actually apply for this job but evidently tried to do so on-line); and a cashier's job at the Dillon's grocery store at 31st Street and Seneca in Wichita. As to the Walgreen's job, Brooks testified that for a period of three months preceding her deposition, she kept trying to

apply to Walgreen's through its computer application system, and even called Walgreen's by telephone, but was unable to get her application to go through

Brooks made no effort during this period to find work as a phlebotomist—the job she had performed for more than ten years—at any hospital, clinic, medical practice or anywhere else.

Brooks has not at any point applied for any position available at Via Christi, notwithstanding that she is "eligible for rehire." (Brooks Dep., p. 13; Meredith Dep., p. 120).

### Conclusions of Law

Via Christi argues in its brief that the court should grant summary judgment on the following grounds. First, it contends that as to the leave taken in June, 2008, Brooks has failed to show that she was entitled to FMLA leave, an essential element of an FMLA infringement claim. *Jones v. Denver Public Schools*, 427 F.3d 1315, 1319 (10th Cir. 2005). According to Via Christi, Brooks was not then entitled to FMLA leave because she did not have a "serious health condition" as that term is used under the Act. *See* 29 U.S.C. § 2612(a)(1)(D); 29 U.S.C. § 2611(11). Specifically, it contends that the standard of a "serious health condition" is not present because of the absence of corroborating medical evidence showing Brooks was incapacitated in June 2008, and because the evidence shows that she did not receive treatment by a medical professional twice during the date of the alleged incapacity. Via Christi additionally argues that Brooks provided insufficient notice of her FMLA leave in June, 2008, that she failed to mitigate her damages, and that the court should not award liquidated FMLA damages under the facts of the case. Brooks denies the validity of each of these arguments.

The FMLA requires that employees receive leave necessary to address "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is

[a]n illness, injury, impairment, or physical or mental condition that involves —

(A) inpatient care in a hospital, hospice or residential medical care facility; or

       (B)  continuing treatment by a health care provider.

29 U.S.C. § 2611(11).

The Department of Labor regulations in place at the time of the alleged infraction provided that under certain circumstances, a serious health condition could exist in the absence of inpatient treatment:

> (a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:
>
> . . . ..
>
> (2) *Continuing treatment by a health care provider.* A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>
> > (I) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
> >
> > > (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provide; or
> > >
> > > (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(I).

The court agrees with the defendant and finds that the plaintiff has failed in her burden of proving the existence of a serious health condition in June of 2008, entitled her to FMLA leave.

First, the plaintiff has failed to provide satisfactory evidence that she suffered from such a condition. In the absence of specific complications, "routine dental or orthodontia problems" are not considered serious health conditions. 29 C.F.R. § 825.114(c). Cases which have addressed leave for dental care have generally followed this regulation, finding that leave arising from routine dental care is not a serious health condition, even where some degree of pain is associated with condition.

*See Hastings v. Carlson Marketing Group*, No 04-3370, 2005 WL 2837391, *2 (D. Minn. Oct. 27, 2005) (summary judgment appropriate on FMLA claim despite plaintiff's allegation that pain from cracked tooth was "mind numbing"); *Brown v. Seven Seventeen HB Philadephia Corp.*, No. 01-1741, 2002 WL 31421924, *4-5 (E.D. Pa. Aug. 8, 2002) (tooth pain with facial swelling, requiring extraction, antibiotic prescribed); *Flanagan v. Keller Products, Inc.*, No. 00-542-M, 2002 WL 313138, at *5-6 (D.N.H. Feb. 25, 2002) (month-long dental condition requiring seven visits to the dentist and ultimately a trip to an oral surgeon was not a serious health condition). *Ducharme v. Cape Indus.*, No. 01-74503, 2002 WL 31545980, at *2 (E.D.Mich. Oct. 8, 2002) (tooth extraction was routine and not related to prior gum disease and recurring tooth abscesses that previously qualified as a serious health condition under the FMLA); *Bond v. Abbott Laboratories*, 7 F. Supp. 2d 967, 974 (N.D. Ohio 1998) (emergency extractions of three teeth due to "severe bone loss and decayed teeth" was not serious medical condition under FMLA). Thus, in *Hayduk v. City of Johnstown*, 580 F.Supp.2d 429, 466 (W.D. Pa. 2008), the court acknowledged that the plaintiff suffered from "chronically bad teeth" as demonstrated by "multiple tooth extractions by an oral surgeon and claimed monthly visits to his regular dentist." Nevertheless, citing 29 C.F.R. § 825.114(c), the court stressed that the plaintiff had failed to prove "that his tooth and gum problems were other than routine, and the Court will not assume otherwise." *Id.*

In contrast, in *Davis v. Boise Cascade Corp.*, No. 03-06081, 2005 WL 1324017 (June 3, 2005) the court found a fact question existed as to whether the plaintiff suffered from a serious health condition. In that case, the plaintiff visited three dentists in ten days, during which there were two attempts at the extraction of teeth which were unsuccessful due to decay, and the oral surgeon who succeeded in the eventual extraction testified that the removals "were not routine because the teeth could not be numbed in the normal way and because of the advanced decay of the tooth crowns." *Id.* at *9.

The plaintiff here has failed to meet her burden of proving the existence of a serious health condition. Instead, the plaintiff has provided only her own subjective assessment that she was

incapacitated from working in the wake of the tooth extraction, coupled with Rupp's subsequent statement that she thinks it was not unreasonable for Brooks to stay off work.

Given the provision that routine dental care is not a serious health condition under the FMLA, the evidence provided by the plaintiff does not satisfy her burden of proof. *See Wessel v. Enersys, Inc.*, 2005 WL 476371 (D. Kan. 2005) (plaintiff's conclusory assertion that she was not able to work did not show entitlement to FMLA leave); *Carter v. Rental Uniform Service of Culpepper*, 977 F.Supp. 753, 761 (W.D. Va. 1997) (incapacity under FMLA requires more than mere allegation by employee).

Incapacity under the FLMA requires evidence beyond the employee's own judgment he or she should not work. *See Olsen v. Ohio Edison Company*, 979 F. Supp. 1159, 1166 (N.D. Ohio 1997). Instead,

> a plaintiff employee must show that he or she was prevented from working *because of* the injury or illness based on a medical provider's assessment of the claimed condition. It does not mean that, in the employee's own judgment, he or she should not work, or even that it was uncomfortable or inconvenient for the employee to have to work. Rather, it means that a "health care provider" has determined that, in his or her professional medical judgment, the employee *cannot* work (or could not have worked) *because of* the illness.

*Id.* (citing *Seidle v. Provident Mut. Life Ins.*, 871 F.Supp. 238, 244 (E.D. Pa. 1994) (emphasis in *Olsen*). *See also Bond v. Abbott Laboratories*, 7 F. Supp. 2d 967, 974 (N.D. Ohio 1998) (plaintiff must show that health care provider "instruct[ed], recommend[ed] or at least authorize[d] an employee not to work for at least four consecutive days for the employee to be considered incapacitated").

The observation by a medical professional, after a plaintiff has unilaterally decided to take leave, that the decision was reasonable, does not meet this burden. As the court observed in *Brannon v. OshKosh B'Gosh, Inc.*, 897 F.Supp. 1028, 1037 (M.D. Tenn. 1995):

> Plaintiff does not meet the definition of serious health condition because, although she saw a doctor and was given three prescriptive drugs, there is no proof that Plaintiff was "incapacitated" for more than three calendar days. Plaintiff stayed home from work for more than three days, but plaintiff cannot show she was unable to work, or that her absence was "due to" her illness. (citation omitted). First, Dr. Clapp never advised plaintiff to remain off work. Dr. Clapp's speculation that it was

reasonable for someone to miss three or four days for her type of illness is insufficient to prove that the absence was necessary. Second, plaintiff's own testimony that she was "too sick to work" is also insufficient to prove that her absence was necessary. Finally, Dr. Clapp cannot testify that plaintiff was unable to perform the functions of her job at the Jamestown plant in light of her illness.

Here the evidence does not reveal that Rupp instructed or advised Brooks to stay home from work following the extraction. Her observation, rendered after Brooks's unilateral decision not to attend work at Via Christi, that the decision was not unreasonable, fails to meet plaintiff's burden of showing that the leave is covered by the FMLA.

Further, in the absence of in-patient treatment, 29 C.F.R. § 825.114(a)(2)(i)(A) provides the plaintiff must demonstrate she sought "continuing treatment by a health care provider," which is defined as an incapacity for three or more consecutive days during which she sought "[t]reatment two or more times by a health care provider." Treatment by an assistant provider such as a nurse qualifies as continuing treatment only if it is done "under direct supervision of a health care provider." *Id*. Further, those multiple visits to a health care provider "must take place during the 'period of incapacity.'" *Jones v. Denver Public Schools*, 427 F.3d 1315, 1322 (10th Cir. 2005) (*citing Thorson v. Gemini, Inc*., 205 F.3d 370, 377 (8th Cir. 2000)). In *Jones*, the court held that because the plaintiff's "period of incapacity involved only a single treatment . . . he was not entitled to FMLA leave and cannot make out a claim for FMLA interference." *Id.*

Brooks responds by noting her return appointments on June 17, 20, and 25 of 2008. But these visits were for the adjustment of her denture plate and were conducted by dental assistants. Dental assistants are not considered "health care providers" under the FMLA. Further, the visits were not prompted by any specific complication from the extraction, and there is no evidence that they occurred under the "direct supervision" of Dr. Rupp.

Brooks also cites the fact that she received prescription pain medication following the extraction, and notes that under 29 C.F.R. § 825.114(b) prescription medication may support finding of a "continuing regimen of treatment." But this provision indicates that such prescription medications – providing specific example of antibiotics – may constitute a continuing regimen of

treatment within the meaning of § 825.114(a)(2)(i)(B), which requires that the regimen be specifically supervised by a health care provider. Here, there is no evidence that Dr. Rupp, after initially prescribing the medication, supervised Brooks' intake of the medicine during the time she was off work in June. Further, the provision in subsection (b) must be read in conjunction with the previously noted statement in subsection (c) that "routine dental or orthodontia problems" are not to be considered serious health conditions. Pain medication is a routine aspect of modern dentistry, and the evidence from Dr. Rupp establishes that, however unusual and uncomfortable the extraction may have been from Brooks' perspective, it was routine from the perspective of a dental professional. Accordingly, the court finds that plaintiff's absences in June of 2008 were not the result of a serious health condition within the meaning of the FMLA.

Brooks also advances the argument (Dkt. 34, at 39) that, even if her dental condition would not be considered a serious health condition under the relevant FMLA regulations, it should still be considered the sort of atypical case which receives protection under FMLA statutory coverage. However, Brooks fails to supply any authority extending such a determination to the dental work herein. The court finds that the regulations adopted by the Secretary of Labor reasonably interpret the provisions in the FMLA, and those regulations have been consistently applied to find that routine dental work is not subject to the FMLA.

Via Christi next argues that Brooks was not entitled to FMLA leave in June of 2008 because she did not supply proper notice. That is, Via Christi argues, even if the court were to hold that Brooks did have a serious medical condition in June of 2008, her failure to give notice of the seriousness of her dental problem is an independent ground for awarding summary judgment.

Via Christi acknowledges that under 29 C.F.R. § 825.303(b), employees are not required to "expressly assert rights under the FMLA or even mention the FMLA but may only state that leave is needed." It contends, however, that the employee must still give some indication of the seriousness of her health condition. Via Christi cites to the court's observation in *Crouch v. J.C. Penney Corp.*, 564 F. Supp. 2d 636, 641 (E.D. Tex. 2008) that "to find that [the employer] was required to put

together that [plaintiff's] absences for oral surgery were covered by FMLA would require a degree of clairvoyance that is, quite simply, not imposed on employers by the statute."

Brooks responds by stressing the low threshold for notice under the FLMA, noting the Tenth Circuit's observation in *Tate v. Farmland Industr.*, 268 F.3d 989, 997 (10th Cir. 2001) (citing 29 C.F.R. § 825.208(a)) that "[i]f the employer is on notice that the employee might qualify for FMLA benefits, the employer has a duty to notify the employee that FMLA coverage may apply."

In *Tate*, the court held the notice requirement of the FMLA was excused where the defendant had placed a commercial vehicle driver employee on involuntary sick leave pending tests to "determin[e] whether his history of seizures and use of antiseizure medication would permit him to continue" in that employment. 268 F.3d at 991. The employer's use of *involuntary* sick leave was controlling, the court holding the employer "was clearly on notice that Plaintiff might qualify for FMLA benefits since Defendant triggered Plaintiff's leave." *Id*. at 997.

However, the employee's notice must still give some indication which would lead a reasonable employer to believe that a serious health condition exists. *See, e.g., Hammon v. DHL Airways, Inc*., 165 F.3d 441, 451 (6th Cir.1999) (notice is sufficient when the employee "gives the employer enough information for the employer to reasonably conclude that an [FMLA-qualifying event] has occurred. Under 29 C.F.R. § 825.303, the employee need not specifically mention the FMLA, but the employee should give "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request" such as "information ... that a condition renders the employee unable to perform the functions of the job."

Here, Via Christi had notice of a pending tooth extraction, but nothing more. As the court noted above, under the FMLA, routine dental procedures are not considered serious health conditions. 29 C.F.R. § 825.114(c). In *Hastings v. Carlson Marketing*, the court specifically noted § 825.114(c) in connection with its holding that an employee's notification that an emergency dental appointment and a follow-up root canal "were not sufficient to put Carlson on notice that Hastings needed FMLA leave." 2005 WL 2837391 at *6.

Next, Via Christi argues that plaintiff's backpay claim is precluded by her failure to seek comparable employment in mitigation of her damages. The duty to mitigate damages is applied in FMLA cases as well as other federal employment actions. *See Franzen v. Ellis Corp.*, 543 F.3d 420, 429-30 (7th Cir. 2008) ("a person discharged – even illegally – cannot simply refuse to seek other employment and expect his former employer to pay his salary until he reaches retirement age." *See also Austin v. Jostens*, No. 07-2380-JAR, 2009 WL 902417 (D. Kan. March 31, 2008) (applying mitigation requirement in FMLA case).

Brooks responds that the duty to mitigate does not require successfully obtaining alternative employment, only that the plaintiff make "reasonable efforts" to do so. *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980). She also cites *Theis v. duPont, Glore Forgan Inc.*, 212 Kan. 301, 307-09, 510 P.2d 1212 (1973) for the proposition that it is "not necessary for her to make another contract of employment with the defendant – who fired her." (Dkt. 34, at 40). Finally, she stresses that in *Franzen* the plaintiff made no attempt at all to mitigate his damages.

*Theis v. duPont* was not an employment action but a dispute between customer and broker arising from unauthorized trading. The court applied contract law and noted "the majority rule is recognized that 'it is not necessary for the plaintiff to make another contract with the defendant who has repudiated, even though he offers terms that would result in avoiding loss.'" 212 Kan. at 308, 510 P.2d at 12 at 1218 (quoting 5 Corbin on Contracts, § 1043, at 272).

More importantly, the point is not that Brooks made no effort to reapply for her employment with Via Christi, which designated her as eligible for rehire, but that she made no attempt at all, reasonable or otherwise, to obtain any *comparable* employment. Here, the uncontroverted evidence is that Brooks made applications for relatively unskilled work, but no effort to obtain work as a phlebotomist for any employer. "The familiar common law duty of mitigating damages is imposed: the employee must make a diligent search for *comparable* employment." *Franzen*, 543 F.3d at 430 (*quoting Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771 (7th Cir.2006)) (emphasis added).

Nevertheless, the court will not award summary judgment on the issue. The burden is on the defendant to show a failure of mitigation. *United States v. Lee Way Motor Freight*, 625 F.2d 918, 937 (10th Cir. 1979). And the defendant's burden is greater than merely showing a failure to use reasonable efforts in obtaining a similar position. Instead, "'the defendant must establish (1) that the damage suffered by plaintiff could have been avoided, i.e., that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position.'" *EEOC v. Sandia*, 639 F.2d 600, 627 (10th Cir. 1980) (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978)). Here, the uncontroverted evidence does not establish that comparable positions were generally available which Brooks might have obtained.

Finally, Via Christi seeks a determination the plaintiff is not entitled to liquidated damages under the FMLA. Ordinarily, a successful plaintiff in an FMLA action is entitled to liquidated damages unless the employer "proves to the satisfaction of the court" that the violation "was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation." 29 U.S.C. § 2617(a)(1)(A)(iii). An employer is entitled to relief if it can show that it acted in subjective good faith, its actions were not in violation of the FMLA, and that this belief was objectively reasonable. *Cooper v. Fulton County*, 458 F.3d 1282, 1287 (11th Cir. 2006). The decision to award liquidated damages rests with the court. *Id.*

Via Christi argues (Dkt. 31 at 32) that its good faith is demonstrated by (a) its general provision of FMLA to its employees, (b) the fact that Brooks used this information and successfully obtained FMLA coverage for prior absences, and (c) the absence of any specific FMLA notice by Brooks in her request for leave in June of 2008. After citing the standards of law relevant to liquidated damages, Brooks "submits that genuine issues of material fact preclude judgment as a matter of law on this issue," (Dkt. 34, at 42) but otherwise fails to present any argument on the subject.

Given the evidence cited by Via Christi, including the ambiguous nature of Brooks' request for leave, the fact that the FMLA generally provides that dental care is not considered a basis for FMLA leave, the defendant's active role in informing employees of potential FMLA rights, and affirmatively granting Brooks FMLA coverage on other occasions, the court in its discretion finds that no award of liquidated damages should be rendered.

The court's resolution of the present motion does not fully resolve the case. As Brooks notes in her response, Via Christi's motion is directed solely at the claims of infringement arising from the June, 2008 dental care. The plaintiff's claims, as reflected in the Pretrial Order, however, are broader.

Under Factual Contentions in the Pretrial Order, Brooks alleges:

> Plaintiff applied for and received intermittent FMLA leave to care for her father who had his leg amputated on July 31, 2006. Frequently, during that period of time, plaintiff was required to transport her father, who resided in Ketcham, Oklahoma, to and from doctors appointments for his continued care. Because of the distance between Wichita, Kansas, and Ketcham, Oklahoma, a 3-hour drive, on some of the nights in December 2006, plaintiff's supervisor Jean Meredith charged plaintiff with attendance violations for being late to work, even though Meredith knew the reason for the lateness and had verbally approved them.

(Dkt. 29, at § 5(a)(3)). Subsequently, the Pretrial Order identifies as a factual issue in the case "[w]hether plaintiff was entitled to FMLA leave on the occasions for which it was requested [including] partial day absences (tardiness) related to travel between Oklahoma and Wichita to care for her father for which intermittent leave had been approved." (*Id.* at § 8(a)(1)). The Pretrial Order also indicates that Brooks advances a claim for FMLA infringement relating to all of the foregoing allegations, which would include the claim that any disciplinary action arising from the December, 2006 absences also constitute FMLA violations.

Defendant's summary judgment arguments, and the present Order, do not address these allegations.

IT IS ACCORDINGLY ORDERED this 4th day of February, 2010 that the defendant's

Motion for Summary Judgment (Dkt. 30) is granted in part and denied in part as provided herein.


s/J. Thomas Marten_____
J. THOMAS MARTEN, JUDGE